**Opinion issued August 21, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00592-CR**

———————————

**MARQUIS ANDREW JOURNET, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1810555**

---

**MEMORANDUM OPINION**

A jury convicted Marquis Andrew Journet of the third-degree felony offense

of conspiracy to commit theft of property worth less than $300,000: an ATM.[1] After

---

[1]    *See* TEX. PENAL CODE § 31.03(a)–(b), (e)(6)(B) (providing that theft offense is
       second-degree felony if "the value of the property stolen is less than $300,000 and

finding the allegations in two enhancement paragraphs true, the jury assessed

Journet's punishment at 25 years' confinement.[2]

In four issues, Journet argues that: (1) the State presented insufficient evidence to support his conviction; (2) the trial court erred by denying his motion to suppress evidence obtained from his cell phone because the affidavit supporting the search warrant did not establish probable cause; (3) the trial court erred by denying his motion for mistrial made during the punishment phase after a witness testified concerning contents of jail cards from prior arrests; and (4) the trial court erred by denying a requested jury definition of "overt act" and a requested jury instruction that Journet and all three of his named coconspirators had to agree to commit an overt act.

We affirm.

---

the property stolen is an automated teller machine"); *id.* § 15.02(d) (providing that offense of criminal conspiracy "is one category lower than the most serious felony that is the object of the conspiracy").

[2] Ordinarily, the punishment range for a third-degree felony is imprisonment for between 2 to 10 years. *Id.* § 12.34(a). When, as here, it is shown on the trial of a felony offense other than a state-jail felony that the defendant "has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final," the punishment range upon conviction of the charged offense is imprisonment for 25 years to 99 years or for life. *Id.* § 12.42(d).

**Background**

### A. A Rise in Houston Area ATM Thefts with Forklifts

The Houston Police Department has a specialized unit called the Criminal Apprehension Team—"CAT"—that focuses on bank-related crimes and researches reports from patrol officers to identify trends in certain types of crime. In summer 2018, the CAT noticed something new about how thieves were targeting ATMs. The novelty involved forklifts.[3] First, perpetrators used a forklift to lift an ATM. They then loaded the ATM onto a truck, took it away, and broke into it to steal the money. This type of theft occurred all over Houston, and it tended to happen between 2:00 a.m. and 6:00 a.m., when it was still dark. This "new method" of ATM thefts indicated to CAT members that "it's the same crew doing this crime."

Typically, this method required multiple people. Each participant played a different role:

> You're going to have your guys that are on the ground, then you're going to have your guys actually at the ATM doing the work, there's going to be somebody operating the forklift, somebody's going to be operating the pickup truck. And the pickup truck comes in; it's almost timed perfectly.

> Forklift comes in, it's usually a stolen forklift, comes in and hits the ATM with the front of the forklift, it lifts it up out of the foundation. As it's doing that, it's pulling around, that stolen truck's coming in, loads it [the ATM] in, they drive off. So you're going to have also lookouts that are in countersurveillance vehicles or switch vehicles in case the

---

[3] Other methods of stealing ATMs included ramming trucks into ATMs at pharmacies, robbing ATM technicians who were servicing the ATM, and hooking a chain from a truck to an ATM to rip it from its foundation.

> guys on the ground are going to have to run and they'll run and jump into these cars and they'll take off.

A person in a "countersurveillance vehicle" looked for law enforcement in the area, while a person in a "switch vehicle" had a vehicle ready to drive suspects away from the location. Suspects typically communicated by using cell phones and Bluetooth headsets.

## B. The Initial Investigation into the Coconspirators

When the CAT discovered the rise in forklift thefts of ATMs, they tried to identify suspects and their vehicles. Eventually, their investigation focused on three men: Charles Dawson, Damon Randolph, and Victor Bruno. Officers surveilled Dawson and learned that he lived at a house on Yorkwood Street in northeast Houston. Bruno and Randolph visited the address often, and officers considered this to be the group's "home base." To avoid drawing the attention of Dawson and his neighbors with on-site surveillance, officers put a "pole cam" on a public light pole near Dawson's house so they could monitor a live feed of activity at Dawson's house from a remote location.

Through this surveillance, officers discovered three vehicles that were frequently present at Dawson's house. The first was a white Jeep Cherokee driven by Bruno. The second was a silver Dodge Dakota truck driven by Randolph. The third was a black Jeep Patriot driven by Journet. Surveillance captured Journet washing this vehicle at Dawson's house in late July 2018.

4

## C. The Attempted ATM Theft

The CAT officers continued surveilling the crew into August 2018. They enlisted the assistance of both marked and unmarked vehicles from other units within HPD. They also received assistance from the Texas Department of Public Safety, which provided air support on two nights through an airplane equipped with an infrared camera and video recording capabilities. The plane flew at an altitude of approximately one mile, and the infrared camera could track the heat signatures of people and moving vehicles.[4] The camera could also display a "daytime" view in case the tactical officer monitoring the camera wanted to "confirm the color of a vehicle or something like that." The officers in the airplane communicated with the officers on the ground through a radio channel.

As August 2 became August 3, activity started happening at Dawson's house. Around 1:30 a.m., Dawson left his house in a Jeep, and Bruno left the house in his white Jeep. The vehicles drove together to a gas station located within a few miles of Dawson's house. A third vehicle pulled up and joined them. Several minutes later, all three vehicles left the gas station together.

---

[4] The trial court admitted video recordings from the airplane's camera taken on successive nights. Two different DPS officers operated the camera, and both officers testified about what the recordings showed on the specific night they monitored the camera. The recordings included audio of the officers narrating the movements of the target vehicles and suspects.

5

Officers followed the vehicles to a residential area near the Hardy Toll Road in north Houston. The CAT officers in their cars stayed out of the area for fear of tipping off the suspects, so they relied on the DPS officer in the plane for reports of the suspects' movements. One of the Jeeps drove to an apartment complex and parked under some trees in the complex's parking lot. The infrared camera showed that this vehicle remained running. Several minutes later, the vehicle that had joined the Jeeps at the gas station started "circling the block" multiple times, indicating to officers that the vehicle was either conducting countersurveillance or acting as a lookout. The second Jeep also drove by multiple times.

A large field lay near the apartment complex, and the DPS officer monitoring the camera in the plane could see "junk vehicles or older vehicles" stored in the field. This officer saw a person walk from the field to the trees where the Jeeps were parked. Several minutes later, a door to one of the vehicles opened and a person got out. The occupants of the vehicles appeared to be communicating with each other, and the person who got out of the vehicle spoke on a cell phone. The DPS officer observed an individual leave one of the vehicles, jump the fence surrounding the field, speak on a cell phone, and steal a flatbed truck from the field. The officer could not identify this individual from his vantage point in the plane.

When the two Jeeps emerged from the residential area, they were newly accompanied by the flatbed truck and Journet. All three vehicles traveled together

6

to the area surrounding the Loop 610 and Highway 290 interchange in northwest Houston. The crew parked the flatbed truck in a commercial parking lot on Ramus Street before returning to Dawson's house. From previous surveillance, officers knew that the Loop 610/Highway 290 area of town (1) had numerous banks, (2) had numerous warehouses with heavy equipment, and (3) did not have a lot of foot or vehicle traffic during early morning hours. The area was therefore a prime location for the forklift thefts of ATMs that the CAT had been investigating.

The following night—August 3 into August 4—the CAT had even more assistance from law enforcement personnel outside of their unit. The CAT placed several officers around the banks located in the Loop 610/Highway 290 area, including a Comerica Bank on Mangum Road. This bank was located mere minutes from where the flatbed truck was parked.

After midnight on August 4, the ground surveillance units and the DPS plane began watching the white Jeep Cherokee driven by Bruno and a black Jeep driven by Dawson on Houston's northeast side. Around 1:40 a.m., these vehicles arrived at an apartment complex on Peachtree Street and the occupants of the vehicles spoke with each other. A person walked out of the apartment complex and joined the

vehicles. Dawson also changed vehicles at this address. Instead of leaving in his black Jeep, he got into the black Jeep Patriot driven by Journet.[5]

Both vehicles—Bruno's white Cherokee and Journet's black Patriot—drove together from Peachtree Street to the Loop 610/Highway 290 area. When the Jeeps reached Ramus Street, where the flatbed truck was parked, they began making U-turns and driving repeatedly and "constantly" around the same streets, indicating that they were searching to ensure there was no police presence in the area. The officers monitoring the area relayed the location of the Jeeps to each other over the radio so they could track the vehicles' movements, but the officers themselves largely remained stationary to avoid letting the suspects know they were being watched.

Around 2:30 a.m., both Jeeps drove to Builders Gypsum Supply on Pasket Lane, a location only a couple blocks away from the Comerica on Mangum Road. Builders Gypsum Supply owned several warehouses, including one that housed heavy equipment such as forklifts. Two people got out of one Jeep and entered the property, while the Jeeps continued driving around the local streets. As one of the Jeeps drove by several minutes later, the two people ran from the business and got back into the vehicle.

---

[5]     The DPS officer watching from the plane testified that the vehicles that arrived at the apartment complex were the same as those that left the complex.

Around 3:00 a.m., two people were again dropped off at Builders Gypsum Supply.[6] To the DPS officer watching from the plane, this behavior suggested that the people broke in earlier and left the business to test whether the break-in would trigger a silent alarm that would send law enforcement. When that did not happen, they cut the lock on a gate and stole a forklift. They stashed the forklift nearby in a hiding spot between two buildings before returning to one of the Jeeps.

The two Jeeps then drove together to a nearby fast-food restaurant. While they were sitting in the parking lot, two other vehicles arrived and parked nearby: Randolph's silver Dakota truck and an unknown sedan. The occupants of all four vehicles spoke with each other for several minutes. Then, all four vehicles left the restaurant together, traveling in the same direction toward where the flatbed truck was parked on Ramus Street.[7] The suspects started removing items from the back of the truck as if "they're trying to make room for something." The suspects then moved the truck to a street adjacent to the Comerica.

Just before 4:00 a.m., the officer assigned to watch the Comerica saw the forklift and flatbed truck drive around the back of the bank. This officer had an unimpeded view of the ATM from a parking lot across the street, and the area around

---

[6]     The DPS officer monitoring the camera could not tell if these were the same two people he had seen dropped off at the business before.

[7]     Officers were not able to apprehend the driver of the sedan, so no further information about this vehicle or its occupants appears in the record.

the ATM was well-lit for security purposes. While the flatbed truck kept its distance, the forklift approached the ATM and "immediately [began] to ram into the ATM to try to knock it off of its foundation." The officer could see one person standing by the ATM and another person in the forklift. He could not identify either person or physically describe them other than to say that one of them was wearing coveralls "[l]ike a mechanic would wear."

This Comerica location had suffered an ATM theft once before, and when Comerica put in the replacement ATM, it added reinforcements—such as a metal bar running through the top of the ATM and anchored to the ground. This security measure worked: the suspects were unable to move the ATM at all despite hitting it repeatedly with the forks of the forklift.[8] Finally, the suspects gave up and ran back towards the flatbed truck, abandoning the forklift by the ATM. The truck left the scene. The officer at the bank waited to see if the suspects would try to steal the ATM a second time, but they did not. Instead, they took the truck back to Ramus Street and "got picked up" by one of the Jeeps.

---

[8]    The ATM was equipped with a surveillance camera inside of it, and the trial court admitted a recording that showed the attempted theft up to the point that the forklift damaged the camera so much it could no longer record. The forklift "completely obliterated" the ATM. Approximately $77,000 was inside the ATM at the time of the attempted theft.

**D.**     **Arrest, Interrogation, and Search of Journet's Cell Phone**

Within several minutes after the attempted ATM theft, CAT officers conducted traffic stops on the silver Dakota truck, the white Jeep Cherokee, and the black Jeep Patriot while the vehicles were still in the same general area as the Comerica. Randolph was the sole occupant of the Dakota, and Bruno was the sole occupant of the Cherokee. Four men were in the Patriot: Journet, who was driving; Dawson; Cedric Whitehurst; and Justin Robinson. At the time of the stop, Journet was wearing shorts and a T-shirt, but Dawson was wearing coveralls.

During the ensuing searches of the vehicles, officers discovered cell phones and matching Bluetooth headsets in each vehicle.[9] In the Patriot, a phone was plugged in and sitting on the driver's floorboard, directly under where Journet had been sitting. The lock screen of the phone was a picture of Journet, and he identified the phone as his and provided his phone number.

HPD detectives interviewed Journet following his arrest, and the trial court admitted a recording of this interview. Journet admitted that he drove the Jeep Patriot, Dawson and Whitehurst were in the car with him, they met him at an apartment on Peachtree, and he drove "out this way" to the Loop 610/Highway 290

---

[9]     Randolph was wearing a headset when he was stopped, and Dawson had a headset around his neck. When officers stopped Bruno, a headset was sitting in the center console next to a wallet with Dawson's driver's license. Officers also found bolt cutters in the back of Bruno's Jeep.

11

area. He told the detectives that he "just drove and looked." Specifically, he looked for "anything that didn't seem right" and "survey[ed] the streets" for "anything that looked suspicious" or "out of place" or "potentially that could be harmful to whatever finna go on." He also said, "I do as instructed. . . . I'm going to follow directions." He denied being "the mastermind of anything" or having authority to call off the operation. Rather, he was "just a pair of eyes."

Officers obtained a search warrant for Journet's cell phone and conducted a forensic analysis of the phone's contents. Defense counsel moved to suppress the phone and all evidence from the phone on several grounds, including failure of the supporting affidavit to establish probable cause. The record reflects that the trial court reviewed the affidavit, but the affidavit itself was never admitted into evidence, not even for the limited purpose of a suppression hearing or for inclusion in the appellate record. The trial court denied the motion to suppress and admitted the phone, evidence relating to the forensic extraction from the phone, call records, and location history data.

An excerpt from the extraction report reflected that on July 29, 2018, approximately one week before the attempted ATM theft, a search was conducted on the Safari web browser for "atm theft houston tx." The user clicked on a local news story entitled, "Thieves use massive forklift to attempt to steal ATM, police say." Another extraction excerpt reflected that on August 2, 3, and 4, Journet made

12

and received numerous calls from a number that was saved under the name "Charlie." This number matched the known phone number for Charles Dawson. This same number was also associated with a different contact name: "Latrice." The excerpted call log displayed both contact names.[10] The forensic analyst that performed the extraction testified that different contact names can be associated with the same phone number.

The detective who reviewed the location history data mapped the cell towers that various phone numbers relevant to this case, including Journet's, interacted with during the evening of the attempted theft. For example, records showed that on the night of August 3, 2018, Dawson called Journet and they spoke for five minutes, and then Journet called Dawson back and they spoke for two minutes. Both Dawson's and Journet's phones interacted with cell towers in the Loop 610/Highway 290 area during these calls. Around 1:30 a.m. on August 4, Journet called Dawson while he was around Peachtree Street. After 2:00 a.m., Journet called Dawson for ten minutes, and they were both in the Loop 610/Highway 290 area. Around 2:30 a.m., Dawson called Journet, Bruno, and then a conferencing call number, which indicated that all three of them were on the same call. Dawson's call to Journet lasted 94 minutes, or

---

[10]  The excerpt showed 22 incoming and outgoing calls. For each of the 9 outgoing calls, the excerpt showed that the calls were made to "Charlie." For each of the 13 incoming calls, the excerpt showed that the calls were from "Latrice." The phone number was the same for all 22 calls.

13

until 3:59 a.m., right around the time that the attempted theft occurred. Location history data reflected that all three phones were in the Loop 610/Highway 290 area at the time Dawson initiated the calls.

**E.     The Jury's Verdict**

During the charge conference, defense counsel requested that the trial court give an instruction on conspiracy to commit theft and a definition of "overt act." The trial court refused to give the requested instruction and definition. The jury found Journet guilty.

During the punishment phase, Journet pleaded "not true" to the allegations in two enhancement paragraphs. The trial court admitted the judgments of conviction for these two offenses. The State then questioned a fingerprint analyst about Journet's fingerprints to attempt to link him to judgments for other prior offenses. The trial court admitted judgments for five other offenses, but it refused to admit judgments for six other offenses and an exhibit containing Harris County jail cards generated during the booking process for Journet's offenses. Ultimately, the jury found the allegations in the enhancement paragraphs true and assessed Journet's punishment at 25 years' confinement, the minimum punishment he could receive due to the findings on the enhancement paragraphs.

This appeal followed.

## Sufficiency of the Evidence

In his first issue, Journet argues that the State failed to present sufficient evidence that he was part of a conspiracy to steal an ATM by using a stolen forklift.

### A.    Standard of Review

When examining sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The factfinder has "full responsibility" to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* Direct and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022). We consider the "cumulative force of all evidence" in determining whether the evidence was sufficient to establish each element of the offense. *Baltimore*, 689 S.W.3d at 341.

The factfinder is the sole judge of the credibility of the witnesses, and it may choose to believe all, some, or none of the testimony presented. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). We may not sit as a "thirteenth juror" and substitute our judgment for that of the factfinder by reevaluating the weight and

credibility of the evidence. *Id.* The factfinder "may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Id.* (quoting *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014)). The factfinder may not reach conclusions "based on mere speculation or factually unsupported inferences or presumptions." *Baltimore*, 689 S.W.3d at 342. When the record supports conflicting inferences, we presume that the factfinder resolved the conflict in favor of the prosecution and defer to that factual determination. *Garcia*, 667 S.W.3d at 762.

We determine sufficiency of the evidence by comparing the evidence produced at trial to the essential elements of the offense as defined by a hypothetically correct jury charge. *Baltimore*, 689 S.W.3d at 341. A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the offense. *Id.* The "law authorized by the indictment" consists of the statutory elements of the offense as modified by the allegations in the indictment. *Id.*

## B. Criminal Conspiracy

A person commits the offense of criminal conspiracy if, with the intent that a felony be committed, (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) one of

16

them performs an overt act in pursuit of the agreement. TEX. PENAL CODE § 15.02(a); *Delay v. State*, 465 S.W.3d 232, 242 (Tex. Crim. App. 2014). The jury may infer that an agreement constituting a conspiracy exists from the acts of the parties. TEX. PENAL CODE § 15.02(b). If the evidence "shows there was no actual, positive agreement to commit a crime," then insufficient evidence supports a conviction for conspiracy. *Lewis v. State*, 402 S.W.3d 852, 861 (Tex. App.—Amarillo 2013), *aff'd on other grounds*, 428 S.W.3d 860 (Tex. Crim. App. 2014) (citation omitted).

Direct evidence of intent is rarely available, so the State may prove existence of a conspiracy through circumstantial evidence. *Id.*; *Rivas v. State*, 473 S.W.3d 877, 886 (Tex. App.—San Antonio 2015, pet. ref'd) ("[D]irect evidence of an agreement among conspirators is not required and rarely exists."). Often, the State must prove a conspiracy by "circumstances from which the existence of the conspiracy is logically deducible." *Rivas*, 473 S.W.3d at 886 (quotations omitted).

Conspiracy requires performance of an overt act in pursuit of the conspiracy, but the defendant himself need not perform the overt act. TEX. PENAL CODE § 15.02(a)(2). Instead, he may be guilty of conspiracy "by doing nothing more than agreeing to participate in the conspiracy" so long as one of the coconspirators performs an overt act in furtherance of the conspiracy. *Lewis*, 402 S.W.3d at 861. The Penal Code does not define "overt act," but the Court of Criminal Appeals has held that the overt act in furtherance of a conspiracy need not "be in itself a criminal

17

act." *McCann v. State*, 606 S.W.2d 897, 898 n.1 (Tex. Crim. App. 1980). Commission "of the underlying substantive offense" is not an element of conspiracy. *Lewis*, 402 S.W.3d at 861; *see McCann*, 606 S.W.2d at 898 ("A conspiracy to commit a crime is a separate and distinct crime from the substantive or 'object' offense.").

## C. Analysis

The charge instructed the jury to find Journet guilty of criminal conspiracy if it found beyond a reasonable doubt that Journet

> did then and there unlawfully, with the intent that a felony, to-wit, theft of an automated teller machine or theft of contents of an automated teller machine, agree with Marquis Journet, and/or Victor Bruno, and/or Charles Dawson, and/or Damon Randolph that they would engage in conduct that would constitute the offense of theft of an automated teller machine or theft of the contents of an automated teller machine, namely, appropriate by acquiring or otherwise exercising control over property, namely, an automated teller machine or the contents of an automated teller machine, of the value of less than three hundred thousand dollars, owned by Joseph Garcia [the corporate security manager of Comerica Bank] with the intent to deprive Joseph Garcia of that property, and in pursuance of said agreement the said conspirators, namely, Marquis Journet, and/or Victor Bruno, and/or Charles Dawson, and/or Damon Randolph intentionally committed or performed the following overt acts: steal a forklift or crash a forklift into the ATM.

The charge also included instructions and an application paragraph authorizing the jury to convict Journet under the law of parties.[11]

---

[11] The law of parties allows the State to enlarge the defendant's criminal responsibility "to include acts in which he may not have been the principal actor." *Ryser v. State*, 453 S.W.3d 17, 28 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). "A person is

Journet argues that the only evidence showing his involvement in a conspiracy was evidence that he "was arrested with Charles Dawson near the bank" and a "record of telephone calls between [him] and Dawson on the day of the theft." He argues that this was outweighed primarily by the State's failure to present evidence of who stole the forklift and who crashed the forklift into the ATM. He also points to evidence that more than one black Jeep was involved and evidence that Dawson's contact number in Journet's phone was the same as the number for "Latrice."

The State's evidence in support of a conspiracy—and Journet's involvement in the conspiracy—included more than just Journet's arrest with Dawson near the Comerica and phone records between the two on the day of the attempted theft. During his interview with police, Journet admitted his involvement in the offense. He told detectives that on the night of the attempted theft, Dawson and Whitehurst visited him at an apartment complex on Peachtree Street, and he drove them in his black Jeep Patriot to the Loop 610/Highway 290 area. He denied being the

---

criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a). A person can be criminally responsible for another's conduct in several ways, including if the person (1) acts with intent to promote or assist the commission of the offense and (2) solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2). We may look to events occurring before, during, and after commission of the offense to determine if a person is a party to an offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.*

"mastermind" or having any authority in the operation. Instead, his role was to drive around and keep watch for anything suspicious.

This statement is consistent with the officers' testimony that they witnessed Journet's black Jeep Patriot and Bruno's white Jeep Cherokee repeatedly drive around the streets surrounding the Comerica, the lot where the stolen flatbed truck was parked, and the business from which the forklift was stolen. When the officers witnessed this behavior, they suspected that the vehicles were conducting "countersurveillance" to make sure there was no law enforcement presence in the area. Journet's statement in his interview confirmed that suspicion.

After the forklift had been stolen and hidden, Journet's vehicle and Bruno's vehicle met up at a nearby restaurant, where they were joined by Randolph's vehicle and an unknown vehicle. Officers witnessed the men talking before they all left the restaurant and drove toward where the flatbed truck was parked. Items were removed from the bed of the truck, and the suspects moved the truck to the street next to the Comerica. Journet had also been present the night before when the flatbed truck was stolen in a different part of town and then moved to the area of the bank.

When officers stopped the vehicles following the attempted theft, they discovered phones and Bluetooth headsets in every vehicle.[12] Randolph and Dawson

---

[12]    Officers also found bolt cutters in the back of Bruno's vehicle. The branch manager of Builders Gypsum Supply—the owner of the forklift—testified that bolt cutters had been used to cut the chains locking the gate to the facility.

were wearing headsets at the time they were stopped. Phone records demonstrated numerous calls between Journet's number and Dawson's number, including a 94-minute call that started around the time the Jeeps first drove by the business that owned the forklift and ended around the time the suspects abandoned their attempt to steal the ATM. Bruno was also part of this call. Location history data reflected that all three phones were in the Loop 610/Highway 290 area at the time of the call.

Although no officer was able to identify who stole the forklift and who crashed the forklift into the ATM, the officer stationed across the street from the Comerica testified that two people were involved in the attempted theft of the ATM itself: one person driving the forklift and another person standing by the ATM and appearing to provide direction. The officer could not provide a physical description of either person, but one of them was wearing coveralls "[l]ike a mechanic would wear." The DPS officer saw the suspects return the flatbed truck to where it had been parked overnight and get into one of the Jeeps. When officers stopped Journet's vehicle minutes after the attempted theft, Dawson was a passenger in the vehicle, and he was wearing coveralls. Journet's vehicle was the only vehicle that had any passengers: Bruno and Randolph were both alone when they were stopped, but Journet had three passengers, suggesting that when the suspects fled the scene, Journet was the one who picked them up.

21

Journet points to two other pieces of evidence that, in his view, weaken his connection to the conspiracy. The record includes evidence that Dawson also owned a black Jeep that he drove to the Peachtree Street apartment complex on the night of the attempted theft. However, Journet himself admitted to driving Dawson and Whitehurst in his black Jeep Patriot to the Loop 610/Highway 290 area where the attempted theft occurred. That admission links Journet's vehicle to the conspiracy. Additionally, the State presented evidence of Dawson's phone number and evidence that this number was saved in Journet's phone under the contact name of "Charlie." The record contains evidence that this number was also associated with the contact name of "Latrice," but the jury resolves conflicts in the evidence, and it could have resolved this conflict in favor of inferring that "Charlie" referred to Dawson.[13] We must defer to that resolution. *See Garcia*, 667 S.W.3d at 762.

When we consider all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense—including an agreement to engage in conduct constituting the offense and

---

[13]    The timing of the calls between that number and Journet's number relative to pertinent events surrounding the attempted theft supports this inference. As discussed above, the phone records reflect that at 2:25 a.m. on August 4, Journet received a call from Dawson's phone number that lasted 94 minutes. 2:25 a.m. is around the time the Jeeps first arrived at Builders Gypsum Supply. 3:59 a.m.—94 minutes later—is around the time the suspects abandoned the attempt to steal the ATM and fled the scene, and it is shortly before the suspects were picked up by a Jeep.

an overt act by one or more co-conspirators in furtherance of the agreement—beyond a reasonable doubt. *See* TEX. PENAL CODE § 15.02(a)–(b). We hold that sufficient evidence supports the conviction.

We overrule Journet's first issue.

## Motion to Suppress

In his second issue, Journet argues that the trial court erred by denying his motion to suppress his cell phone, all phone records, and reports analyzing the contents of his phone. He asserts that the search warrant for his phone was invalid because the affidavit supporting the search warrant did not demonstrate a nexus between the phone and illegal activity and therefore lacked probable cause.

### A. Standard of Review

Both the United States and Texas Constitutions protect people from unreasonable searches and seizures by generally requiring police officers to obtain a warrant based on probable cause prior to conducting the search or seizure. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9; *see also* TEX. CODE CRIM. PROC. art. 18.01(b) ("No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance."). Probable cause exists when, under the totality of the circumstances, there is a fair probability that evidence of a crime will be found in a particular location. *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App.

23

2022). "This is a flexible, non-demanding standard." *Id.* "Probable cause deals with probabilities"; although it requires "more than mere suspicion," it also requires "far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023) (quotations omitted).

Ordinarily, we apply a bifurcated standard to review a trial court's ruling on a motion to suppress, giving almost total deference to the trial court's determination of historical facts that are supported by the record and reviewing de novo the application of the law to the facts. *State v. Heath*, 696 S.W.3d 677, 689 (Tex. Crim. App. 2024). However, when the trial court determines whether probable cause supports the issuance of a search warrant, the court only considers the four corners of the affidavit and makes no credibility determinations. *Baldwin*, 664 S.W.3d at 130. "The test is whether a reasonable reading of the supporting affidavit provides a substantial basis for the magistrate's conclusion that probable cause existed." *Diaz v. State*, 632 S.W.3d 889, 892 (Tex. Crim. App. 2021).

We apply a highly deferential standard when reviewing the magistrate's decision to issue a warrant due to the constitutional preference for police officers to conduct searches pursuant to a warrant. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). We analyze search warrant affidavits in a "commonsense

manner" rather than a "hyper-technical" manner. *Baldwin*, 664 S.W.3d at 130. We defer to all reasonable inferences a magistrate could have made. *Id.*

## B. Preservation of Error

In response to Journet's second issue, the State argues that he failed to preserve this issue for appellate review because he did not ensure that the search warrant affidavit became part of the appellate record. We agree.

The State bears the burden to justify a contested search or arrest. *Moreno v. State*, 858 S.W.2d 453, 461 (Tex. Crim. App. 1993); *Miller v. State*, 736 S.W.2d 643, 648 (Tex. Crim. App. 1987). If the State intends to rely on a search warrant, "it is incumbent on the State to produce the warrant and its supporting affidavit for the inspection of the trial court." *Moreno*, 858 S.W.2d at 461. Once the State produces the warrant and affidavit and they are "exhibited" to the trial court, the defendant bears the responsibility to ensure that the warrant and affidavit are included in the record "if they are to be reviewed on appeal."[14] *Id.*; *Miller*, 736 S.W.2d at 648; *see*

---

[14] This Court has followed this preservation procedure, as have our sister intermediate appellate courts. *See, e.g.*, *Boldon v. State*, No. 01-12-00486-CR, 2013 WL 5637031, at *7–8 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. ref'd) (mem. op., not designated for publication) (concluding that defendant failed to preserve challenge to affidavit supporting search warrant for appellate review when trial court reviewed affidavit, but defendant did not ensure that affidavit was included in appellate record); *Feagins v. State*, No. 02-24-00158-CR, 2025 WL 1717287, at *11 (Tex. App.—Fort Worth June 19, 2025, no pet.) (mem. op., not designated for publication) ("Because Appellant has failed in his burden to bring forward a record that enables us to review the trial court's determination, we are left without any means to determine whether the trial court was correct in its view that the search warrant was lawful."); *Washington v. State*, No. 14-23-00723-CR, 2025 WL

25

*also Cannady v. State*, 582 S.W.2d 467, 469 (Tex. Crim. App. 1979) ("[I]f defense counsel desires a review of the search warrant and affidavit on appeal, it is necessary for him to offer for the record on a bill of exception copies of the search warrant and of the affidavit.").

At the close of the first day of trial, one of the CAT members testified about the traffic stop of the Jeep Patriot and items that were recovered during the stop, including Journet's phone. The officer testified that he obtained a warrant to search the phone. During the officer's testimony, the State introduced the phone, and defense counsel made an oral motion to suppress. The trial court recessed trial for the day and heard brief arguments on the motion, including an argument by defense counsel that "[t]he testimony that's already been elicited contradicts the statement in the search warrant and that is that the phone belonged to Marquis Journet." Defense counsel requested that the trial court "review the affidavit in camera to see if the affidavit supports the statements made in the search warrant." The trial court asked if anyone could provide it with the affidavit, and one of the prosecutors responded that she could do so. The court stated that it would review the relevant materials "this

---

926468, at *4 (Tex. App.—Houston [14th Dist.] Mar. 27, 2025, no pet.) (mem. op., not designated for publication) ("Appellant had the responsibility to ensure that the warrant and affidavit were included in the appellate record. Because the affidavit does not appear in the record, Appellant failed to preserve any alleged error for review.") (internal citations omitted).

evening." Neither the State nor defense counsel offered the affidavit into evidence for the purpose of ruling on the motion to suppress.

When trial resumed the following morning, the court stated that it had "reviewed the warrant on the phone dump based off of the affidavit and is denying [the] defense motion to suppress at this time." The court did not, however, admit the search warrant itself—as the State had requested—because the court believed that the State had not yet established the chain of custody for the phone, so the relevancy of the warrant had also not been established.

The State did not immediately seek admission of the phone following the trial court's ruling. Instead, the State waited until the third day of trial during the testimony of another CAT member. Defense counsel objected and argued that officers had no probable cause to seize the phone. Counsel argued that there was no nexus between the phone and any criminal activity, nor was there any nexus between the phone and Journet aside from the fact that it was present in a vehicle Journet was driving at the time of the traffic stop. Defense counsel did not request that the affidavit supporting the search warrant for the phone be included in the appellate record. The trial court overruled defense counsel's objection.

On the last day of the guilt-innocence phase, the State presented two witnesses who offered testimony relevant to Journet's phone: the witness who conducted the forensic extraction of the contents of the phone and the witness who obtained

27

location history data to show the approximate location of the phone at various times on the night of the attempted theft. Defense counsel objected to the forensic extraction report, arguing that officers illegally seized the phone, there was no nexus between the phone and Journet, and the affidavit supporting the search warrant for the phone did not establish probable cause. In overruling this objection, the trial court noted that it had "reviewed the affidavit attached to the warrant in question." Defense counsel made a similar objection to the testimony concerning location history data. Defense counsel did not—at either point—request that the court include the affidavit in the appellate record.

Although the trial court ultimately admitted into evidence the search warrant for the phone, the court never admitted the supporting affidavit, not even for the limited purpose of inclusion in the appellate record. Defense counsel objected to phone-related testimony and exhibits on multiple occasions throughout the trial, but counsel never requested that the court include the supporting affidavit in the appellate record, nor did counsel make a bill of exception concerning the supporting affidavit. The record indicates that the trial court reviewed the supporting affidavit, but defense counsel did not ensure that the affidavit became part of the appellate record. *See Moreno*, 858 S.W.2d at 461; *Miller*, 736 S.W.2d at 648; *Cannady*, 582 S.W.2d at 469. We therefore conclude that Journet did not preserve his complaint about the affidavit for appellate review.

We overrule Journet's second issue.

## Motion for Mistrial

In his third issue, Journet contends that the trial court erred by denying his motion for mistrial made after a witness during the punishment phase of trial testified concerning the contents of Journet's prior jail cards from the Harris County Jail, an exhibit that was not admitted into evidence. This complaint fails. The jury assessed the minimum punishment, so the evidence cannot have caused any harm.

### A.      Standard of Review

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024). Under this standard, we do not substitute our judgment for that of the trial court. *Id.* Instead, we must decide whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion "when no reasonable view of the record could support [its] ruling." *Id.* We must uphold a trial court's ruling on a motion for mistrial if the ruling was "within the zone of reasonable disagreement." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

A mistrial is a remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quotations omitted); *see Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) ("A mistrial is an appropriate

remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors."). This is an "extreme remedy" that halts trial proceedings, and therefore a trial court should grant a mistrial "only when residual prejudice remains after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884–85 (quotations omitted). We consider the particular facts of the case when determining whether an error requires a mistrial. *Id.* at 884.

Asking an improper question "will seldom call for a mistrial" because an instruction to disregard can usually cure any harm. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). "A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Id.*; *see Smith v. State*, 491 S.W.3d 864, 873 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) ("Unless clearly calculated to inflame the minds of the jury or of such damning character as to make it impossible to remove the harmful impression from the jurors' minds, a witness's reference to a defendant's criminal history or previous incarceration, standing alone, generally is cured by a prompt instruction to disregard.").

## B. Analysis

In addition to the allegations relating to the charged offense, the indictment alleged two enhancement paragraphs: (1) a prior felony conviction for aggravated

assault on May 19, 2000, in cause number 781754, in the 182nd District Court of Harris County; and (2) a prior felony conviction for possession of a controlled substance on July 7, 2004, in cause number 981721, in the 184th District Court of Harris County. The State arraigned Journet on these two enhancements at the beginning of the punishment phase of trial, and Journet pleaded "not true" to both enhancements.

The State called Diane Medina, a latent fingerprint examiner with the Harris County Sheriff's Office, as its sole witness during the punishment phase. Medina took inked fingerprints from Journet on the morning of the punishment phase, and the State asked her to compare those prints to prints found on various documents, including judgments of conviction and "jail cards" created through the booking process at the Harris County Jail.

The trial court admitted State's Exhibit 75 and State's Exhibit 79, two "pen packets" relating to Journet's prior convictions alleged in the enhancement paragraphs. State's Exhibit 75 contained Journet's name, displayed his picture, and included a judgment adjudicating guilt for the second-degree felony offense of aggravated assault in cause number 781754 in the 182nd District Court of Harris County. The date of this judgment was May 19, 2000. State's Exhibit 79 contained Journet's name, displayed his picture, and included a judgment of conviction for the third-degree felony offense of possession of a controlled substance in cause number

31

981721 in the 184th District Court of Harris County. The date of this judgment was July 7, 2004.

The State also sought to introduce evidence that Journet had prior convictions beyond the two convictions alleged in the enhancement paragraphs. It showed Medina twelve exhibits and asked if she recognized the documents. Medina was "able to identify the defendant" in five of the exhibits, but "the remaining ones were not of sufficient quality." The State questioned Medina about seven of the "remaining" exhibits and asked whether the listed name matched Journet's name. Medina responded that the names matched. The trial court ultimately admitted only two of those seven exhibits.

The State then offered State's Exhibit 68, a document that purportedly contained multiple "jail cards with the name Marquis Journet."[15] Defense counsel objected based on Medina's failure to connect the prints to Journet as well as "all documents that are not alleged in the indictment." The trial court sustained the objection with respect to "the ones that don't have sufficient prints at this time."

The State asked Medina whether she had an opportunity to compare the fingerprints contained within Exhibit 68 to Journet's known fingerprints. Medina testified that all the fingerprints contained in Exhibit 68 and the fingerprints that she

---

[15]    The trial court did not admit Exhibit 68 into evidence. This exhibit is therefore not part of the appellate record.

herself took from Journet on the morning of the punishment phase came "from the same source." The trial court continued to sustain defense counsel's objection to Exhibit 68, reasoning that "we're not getting into arrests until they are made relevant."

In an attempt to obtain admission of Exhibit 68 and the other exhibits the State had shown to Medina, the State questioned Medina about particular exhibits. For example, the State questioned Medina about the contents of Exhibit 69, a 1996 judgment for unlawful carrying of a weapon that the trial court ultimately admitted into evidence. The State then used the fingerprints contained on the jail card for this offense—fingerprints that matched Journet's known prints—and other "identifiers" in Exhibit 68 to link Exhibit 69 to Journet.

Next, the State started to repeat the same exercise with Exhibit 70—a 1997 judgment for unlawful carrying of a weapon that the trial court ultimately admitted into evidence—but defense counsel objected:

| | |
|---|---|
| Defense counsel: | Judge, at this time I'd like to object. And the objection is that the documents have not been admitted into evidence but they're reading the contents of the document in the presence of the jury. |
| The Court: | Sustained. Sustained. |
| Defense counsel: | And further, Judge, we would ask that the jury be instructed to disregard the evidence or the testimony that was heard from documents that have not been admitted into evidence. |
| The Court: | Overruled. |

33

. . . .

| | |
|---|---|
| Defense counsel: | Judge, while we're here [at a bench conference], what was the Court's ruling on our instruction to the jury to disregard? |
| The Court: | The Court's going to overrule that. |
| Defense counsel: | I'm sorry? |
| The Court: | The Court is overruling that. |
| Defense counsel: | All right. And even though the Court is overruling it, Judge, I think just the sheer volume of paperwork that the prosecution has presented to this witness, it—it gives an impression that there is a lot in terms of convictions and extraneous offenses which are not admissible at this point and the Court has not been—so we're going to say—we're going to ask, since the jury has seen it, we're going to ask the Court to grant a mistrial. |
| The Court: | Okay. And that is denied. I'm going to allow the State to continue with their direct examination. |

The State then asked Medina about three additional exhibits. Medina compared the fingerprints on these exhibits to Journet's known prints and to the prints contained in the jail cards of Exhibit 68 and concluded that all prints matched. The trial court admitted these three exhibits, but it did not admit Exhibit 68.

Even if we assume that the trial court erred by denying Journet's motion for mistrial, we conclude that any error was harmless. The punishment phase jury charge instructed the jury that if it found the allegations in both enhancement paragraphs to be true, "you will assess the punishment of the defendant at confinement . . . for not less than twenty-five years nor more than ninety-nine years, or life." *See* TEX. PENAL

CODE § 12.42(d) ("[I]f it is shown on the trial of a felony offense other than a state jail felony . . . that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years."). The jury found the allegations in both enhancement paragraphs to be true and assessed Journet's punishment at confinement for 25 years.

On appeal, Journet does not challenge the sufficiency of the evidence supporting the jury's finding with respect to the enhancement paragraphs. Nor does he challenge the admissibility of Exhibits 75 and 79, the two exhibits that contained judgments of conviction corresponding to the enhancement paragraphs. Instead, he argues that the "testimony about jail cards which showed multiple arrests without admissible criminal judgments" left a "harmful impression" with the jurors, and the trial court should have granted his motion for mistrial. Having found the allegations in the enhancement paragraphs true—again, a finding not challenged on appeal— the jury was required to assess Journet's punishment at a minimum of 25 years' confinement. *See id.* That is what the jury did. Even if it believed that Journet had a lengthy criminal history, it still assessed the minimum amount of punishment legally permissible under the repeat-offender punishment provision of the Penal Code.

35

We hold that any error in the trial court's refusal to grant a mistrial during the punishment phase was harmless.

We overrule Journet's third issue.

## Jury Charge

Finally, in his fourth issue, Journet raises two complaints about the jury charge. He argues that the trial court erred by refusing his requested instruction on conspiracy to commit theft and his requested definition of "overt act."

### A.    Standard of Review

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14; *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022) ("The charge is meant to inform the jury of the applicable law and how to apply it to the facts of the case."). We analyze claims of jury charge error in two steps: we first determine whether the charge was erroneous, and if it was, we determine whether the error caused harm. *Alcoser*, 663 S.W.3d at 165. If, as here, the defendant timely objected to the alleged charge error, the record must demonstrate "some harm" for the defendant to obtain relief. *Id.*

The "some harm" standard still requires that the record show "actual" as opposed to "theoretical" harm. *French v. State*, 563 S.W.3d 228, 235 (Tex. Crim. App. 2018). We must reverse "if the error was calculated to injure the rights of the

defendant." *Jordan v. State*, 593 S.W.3d 340, 347 (Tex. Crim. App. 2020). We assess harm in light of several factors: the entire jury charge; the state of the evidence, including the contested issues and weight of the probative evidence; the argument of counsel; and any other relevant information that the trial record as a whole reveals. *Alcoser*, 663 S.W.3d at 165 (quotations omitted).

## B.    Analysis

### 1.    Journet's proposed instruction and definition

During the charge conference, defense counsel requested that the trial court give an instruction on criminal conspiracy that tracked the allegations in the indictment:

> The Defendant, Marquis Andrew Journet, stands charged by indictment with the offense of criminal conspiracy to commit a felony, to-wit theft of an automated teller machine and theft of the contents of the automated teller machine agree with Marquis Journet, Victor Bruno, Charles Dawson, *and* Damon Randolph that they would engage in conduct that would constitute the offense of theft of an automated teller machine and theft of the contents of an automated teller machine, namely, appropriate by acquiring and otherwise exercising control over property, namely an automated teller machine and the contents of an automated teller machine of the value of less than three hundred thousand dollars, owned by Joseph Garcia [of Comerica Bank], with the intent to deprive Joseph Garcia of that property, and in pursuance of said agreement the said Marquis Journet, Victor Bruno, Charles Dawson *and* Damon Randolph intentionally committed and performed the overt acts: steal a forklift *and* crash a forklift into the automated teller machine.

(Emphasis added.) The indictment alleged the agreement element and the overt act element in the conjunctive, and this instruction contained similar language. The State

37

opposed this instruction, arguing that the contents of this instruction were more appropriate for the application paragraph of the charge. The trial court denied the requested instruction.

Defense counsel also requested that the trial court include the following definition of "overt act":

> Overt Act means: An outward act done in pursuance of the crime and a manifestation of an intent or design, intending the completion of the crime. An overt act must be something more than evidence of the conspiracy. It must be an act done by one of the parties to carry out the intent and it must be a step towards execution of the conspiracy.

The State opposed inclusion of this definition because the Penal Code does not define "overt act," and it would therefore be inappropriate to define that term in the charge. The trial court denied the requested definition.

The charge given to the jury defined "conspiracy" and included an application paragraph:

> By the term "conspiracy" as used in these instructions, is meant that, with the intent that a felony be committed, one agrees with *one or more persons* that they *or one or more of them* engage in conduct that would constitute the offense, and he *or one or more of them* performs an overt act in pursuance of the agreement. An agreement constituting a conspiracy may be inferred from acts of the parties.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 4th day of August, 2018, in Harris County, Texas, the defendant, Marquis Andrew Journet, did then and there unlawfully, with the intent that a felony, to-wit, theft of an automated teller machine or theft of contents of an automated teller machine be committed, agree with Marquis Journet, *and/or* Victor Bruno, *and/or* Charles Dawson, *and/or* Damon Randolph that they would engage in conduct that would

38

constitute the offense of theft of an automated teller machine or theft of the contents of an automated teller machine, namely, appropriate by acquiring or otherwise exercising control over property, namely, an automated teller machine or the contents of an automated teller machine, of the value of less than three hundred thousand dollars, owned by Joseph Garcia with the intent to deprive Joseph Garcia of that property, and in pursuance of said agreement the said conspirators, namely, Marquis Journet, *and/or* Victor Bruno, *and/or* Charles Dawson, *and/or* Damon Randolph intentionally committed or performed the following overt acts: steal a forklift *or* crash a forklift into the ATM . . . then you will find the defendant guilty of criminal conspiracy to commit theft of property with a value of less than three hundred thousand dollars, as charged in the indictment.

(Emphasis added.) Relevant to Journet's fourth issue, the primary difference between his proposed instruction and the charge given to the jury is that the jury charge instructed the jury on the agreement element and the overt act element in the disjunctive, while the proposed instruction included conjunctive language.

### 2. Instruction on conspiracy to commit theft

Journet argues that he was entitled to his requested conspiracy instruction because "this charge instructed the jury to find him guilty only if [Journet], Bruno, Dawson, and Randolph all agreed to steal a forklift and crash the forklift into the ATM," but the given charge required Journet "to agree with only one of the alleged 3 coconspirators to commit only one of the two alleged overt acts." The State argues that the trial court did not err by refusing the requested instruction because it did not accurately state the law: the requested instruction required all four of the coconspirators—Journet, Bruno, Dawson, and Randolph—to enter into an

agreement and commit both overt acts. But Penal Code section 15.02 only requires (1) Journet to agree "with one or more persons that they or one or more of them" would engage in conduct constituting the offense and (2) Journet "or one or more of them" to perform an overt act. We agree with the State.

The trial court must give the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. Because the jury charge is "the instrument by which the jury convicts," it "must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quotations omitted). The charge should "correctly instruct[]" the jury "in accordance with the indictment." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). However, even if the indictment alleges different theories or different means of committing an offense in the conjunctive, a charge that submits alternate theories or alternate means in the disjunctive is not erroneous. *See Pizzo v. State*, 235 S.W.3d 711, 715 (Tex. Crim. App. 2007) ("[D]ifferent modes of commission may be presented in a jury instruction in the disjunctive when the charging instrument, in a single count, alleged the different means in the conjunctive."); *Zanghetti v. State*, 618 S.W.2d 383, 386–88 (Tex. Crim. App. 1981) (discussing prior caselaw allowing submission of alternate means of committing offense and definitions of culpable

mental states in disjunctive even though indictment charged means of committing offense and culpable mental state in conjunctive).

Under Penal Code section 15.02, a person commits the offense of criminal conspiracy if, with intent that a felony be committed:

> (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and
>
> (2) he or one or more of them performs an overt act in pursuance of the agreement.

TEX. PENAL CODE § 15.02(a). The statute does not require the defendant to agree with all the alleged coconspirators, nor does it require all the alleged coconspirators to perform the alleged overt acts. Instead, "[c]onspiracy requires an agreement *with one or more persons* that they *or one or more of them* engage in conduct that would constitute the offense; and the person *or one or more of them* performs an overt act in pursuance of the agreement." *Lewis*, 402 S.W.3d at 860–61 (emphasis added). "A person may be guilty of conspiracy by doing nothing more than agreeing to participate in the conspiracy so long as *another co-conspirator* does some overt act in furtherance of the conspiracy." *Id.* at 861 (emphasis added).

Journet's proposed instruction included requirements that section 15.02 does not: a requirement that Journet agree with all three other alleged coconspirators to engage in conduct constituting the offense of theft; that Journet and all three other alleged coconspirators performed the overt acts; and that the four coconspirators

41

performed both alleged overt acts. Although the indictment charged Journet in the conjunctive, the trial court did not err by instructing the jury in the disjunctive.[16] We conclude that the trial court did not err by refusing Journet's requested instruction.

### 3.     Definition of "overt act"

Journet acknowledges that "overt act" is not defined in the Penal Code, but he argues that the trial court should have defined it in the charge anyway because the omission of such a definition "unnecessarily confused" the jury. The State argues that providing a definition of "overt act" in the charge would have been improper because the Penal Code does not define the term, and there is no indication in the caselaw that the term has acquired a technical or particular legal meaning that should apply. We agree with the State.

In addition to "distinctly setting forth the law applicable to the case," the jury charge must not express "any opinion as to the weight of the evidence," sum up the

---

[16]    The Austin Court of Appeals has overruled a defendant's complaint that the jury charge improperly allowed the jury to convict the defendant based on proof "of an agreement between appellant and one or more of the alleged co-defendants and the alleged named but unindicted co-conspirators rather than all the other defendants and co-conspirators alleged in the indictment" because "[g]enerally, it is proper to plead in the conjunctive and charge in the disjunctive." *Carrion v. State*, 802 S.W.2d 83, 89–90 (Tex. App.—Austin 1990, no pet.); *see also Garcia v. State*, 46 S.W.3d 323, 327 (Tex. App.—Austin 2001, pet. ref'd) (stating in context of appeal of conviction for engaging in organized criminal activity—which also requires agreement with one or more persons to engage in conduct that constitutes offense and overt act—that "[t]he names of the various coconspirators and the various overt acts alleged in the indictment were, in effect, alternate means of committing the offense").

testimony, discuss the facts, or use any argument "calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. art. 36.14. Generally, definitions for terms that are not statutorily defined are not considered to be "applicable law" under article 36.14, "and it is thus generally impermissible for the trial court to define those terms in the jury instructions." *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015). Instead, jurors should be allowed to "freely read [undefined] statutory language to have any meaning which is acceptable in common parlance." *Id.* (quoting *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012)). Although appellate courts may "articulate a definition of a statutorily undefined, common term in assessing the sufficiency of the evidence on appellate review," a trial court risks improperly commenting on the weight of the evidence by including that definition in a charge. *Kirsch*, 357 S.W.3d at 651.

An exception to the general rule of not defining statutorily undefined terms in the jury charge exists for terms that have "a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning." *Green*, 476 S.W.3d at 445 (quoting *Kirsch*, 357 S.W.3d at 650). These terms "are considered as having been used in their technical sense, and, therefore, it is not error for the trial court to include in its instructions a precise, uniform definition to guide the jury's deliberations." *Id.* (quotations omitted).

43

The Penal Code does not define "overt act." *See* TEX. PENAL CODE § 1.07(a). Journet points to no law holding that "overt act" has a "known and established legal meaning" or has "acquired a peculiar and appropriate meaning in the law" such that a "precise, uniform definition" of the term can permissibly be used to guide the jury's deliberation. *See Green*, 476 S.W.3d at 445. We therefore conclude that because "overt act" is not statutorily defined and it has not acquired a "known and established legal meaning" or a "peculiar" or "technical" meaning, the trial court did not err by refusing Journet's requested definition of "overt act" and instead leaving the term undefined in the jury charge.

We overrule Journet's fourth issue.

## Conclusion

We affirm the judgment of conviction.


David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).